G & C ENTERPRISES, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 99–370C.

United States Court of Federal Claims.

March 6, 2003.

Paul T. Devlieger, Philadelphia, PA, for plaintiff. Derek B. Eddy, Harry R. Blackburn & Associates, of counsel.

Wanda Rubianes–Collazo, Washington, DC, for defendant, with whom was Assistant Attorney General Robert D. McCallum, Jr. J. Mackey Ives, Department of the Army, of counsel.

## ORDER

MILLER, Judge.

This case brings into question, on defendant's motion for summary judgment, whether the U.S. Army took beneficial occupancy of a project being constructed by plaintiff before a storm caused damage to the facilities. Failing a ruling that the risk of loss passed to the U.S. Army, the contractor faults the adequacy of contract specifications, alleging that they were not sufficient to withstand the elements. The court deems argument unnecessary.

## FACTS

The following facts are undisputed, unless otherwise noted. On February 1, 1994, the U.S. Army awarded a firm fixed-price contract, No. DAHA28–94–C–0001 to G & C

Enterprises, Inc. ("plaintiff"). The contract incorporated by reference Federal Acquisition Regulation (FAR), 48 C.F.R. §§ 52.236–7 & 236–11 (2002), commonly known as the "Permits and Responsibilities" and the "Use and Possession Prior to Completion" clauses. The contract was for the construction of a project located at McGuire Air Force Base in New Jersey to fulfill a requirement for the New Jersey Air National Guard.

The contract required plaintiff to construct two facilities: a composite maintenance hangar and a fuel systems maintenance dock. The hangar is a 59,000 square-foot facility. Its purpose is to house military aircraft during maintenance. The hangar walls do not include pressure relief panels, which are designed to release from the steel support structures in the event of an internal fire or explosion, reducing the internal pressure on the structure and minimizing personal injury and damage to the facility. Instead, the wall panels in the hangar are fixed panels, which do not release from the structure upon impact. The fuel dock is a 19,500 square-foot facility intended to provide shelter for aircraft during fuel systems maintenance and was constructed with 13,400 square feet of pressure relief panels, which were attached to the steel structure by a wire tether designed to prevent a panel from becoming airborne when released from the structure.

Plaintiff began performing the contract in or about February 1994. On June 22, 1996, a severe storm with wind gusts exceeding 84 miles per hour, struck McGuire Air Force Base and significantly damaged the hangar and the fuel dock. Plaintiff was not insured against any damage resulting from the storm. LTC Edward R. Sain, Base Civil Engineer, initially evaluated the storm damages at approximately $1 million. The Army retained Foster Wheeler, an engineering consultant, to prepare a formal cost estimate for the repairs. He estimated a cost of $787,313.00 to repair the damage to the project caused by the storm.

Contracting Officer Capt. John W. Simms issued Modification P00013 on December 19, 1996. The modification was issued as a no-cost change order. The contract modification directed plaintiff to resume work on the contract, prepare a critical path method for the remaining work, repair damage caused by the storm, and complete all outstanding items which were not completed prior to the storm.

Plaintiff sought funding for the work required by the modification from its surety, American Insurance Company ("AIC"), which provided the funds to complete the repairs and rebuild the two damaged facilities.

Plaintiff alleges that it reached an informal agreement with AIC and the Army whereby, "in return for [AIC's] providing financial assistance in the completion of the Project, the Army would support and sponsor and thereby recommend extraordinary contractual relief under [Public Law] No. 85–804, in order to secure the funds necessary to reimburse [plaintiff]." Compl. filed June 10, 1999, ¶ 16.

Plaintiff filed a request for extraordinary contractual relief ("ECR"), pursuant to Public Law No. 85–804, 50 U.S.C. §§ 1431–1435 (2003), on or about January 28, 1997. The ECR request asked for an upward price adjustment of $903,284.00. This amount was based on Mr. Wheeler's repair estimate, with added overhead of 21.14% for direct costs, a 10% profit, and 1% for the cost of bonding and insurance.

Plaintiff alleges that it proceeded with the work under protest after receiving financing from its surety, and that it completed the project reconstruction according to the original plans and specifications. The total cost to reconstruct the damaged facilities is claimed to be $1,026,316.94 over and above the original contract price.

A letter dated October 16, 1997, from the contracting officer, listed September 10, 1997, as the date of the Army's acceptance of beneficial occupancy of the two facilities. Plaintiff contends that the projects were fit for their intended use prior to that date and, as a consequence, that the Army accepted the beneficial occupancy of the two projects prior to September 10, 1997.

On or about April 17, 1998, plaintiff submitted to the contracting officer a claim for an equitable adjustment in accordance with the changes clause of the contract, and pur-

suant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (2003) (the "CDA"). The adjustment requested was in the amount of $1,026,316.94. Plaintiff alleges that it has made several requests for a final decision from the contracting officer, but none was forthcoming as of June 10, 1999, the date on which the complaint was filed. Plaintiff deemed its claim denied, 41 U.S.C. § 605(c)(5), and filed this suit for equitable adjustment.

Plaintiff's complaint advances four claims. Count I claims $1,026,316.94, which represents the sum plaintiff requested in its ECR claim under the contract's changes clause. Plaintiff alleges that the risk of loss for damage had shifted to the Army prior to the storm, because at that time the project was more than 99% complete and plaintiff had achieved substantial completion; the Army had begun to occupy the facilities; and the project was constructed in accordance with the specifications.

Count II of the complaint pleads that the Army made an "express[ed] and implied warranty that [the plan] specifications were sufficient so that a satisfactory Project would result from [plaintiff's] efforts." Compl. ¶ 29. Alleging that the Army's plans and specification for the hangar and fuel dock were insufficient, plaintiff seeks judgment in the amount of $1,026,316.94, which represents the amount it sought through the equitable adjustment request.

Count III alleges that the Army and plaintiff had reached an informal agreement to compensate plaintiff for the reconstruction of the project, including the processing of relief pursuant to Public Law No. 85–804. The Army's refusal to compensate plaintiff therefore constitutes a breach of contract. Plaintiff claims that the fair and reasonable value of the work is approximately $1,300,000.00, and represents a portion of plaintiff's indebtedness to AIC.

Count IV pleads breach of contract resulting from the Army's allegedly making a cardinal change to the contract. Plaintiff alleges that Modification P00013 altered the scope of the contract "far beyond that which was required from, and anticipated by, [plaintiff]." Compl. ¶ 39. Because the modifica-

tion constitutes a breach of the contract, plaintiff claims the cost incurred in performing the work ordered by the modification: $1,300,000.00.

## DISCUSSION

RCFC 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it will make a difference in the result of a case under the governing law. *Id.* at 248, 106 S.Ct. 2505. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Id.*

In ruling on a summary judgment motion the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. 1348.

The initial burden is on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact and may be discharged if the moving party can demonstrate that there is an absence of evidence to support the non-

moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case for which it bears the burden of proof. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### 1. *Beneficial occupancy*

■ The contract allocated the risk of loss to the Army at the time of the storm because, as plaintiff argues in Count I: 1) plaintiff had achieved substantial completion and the project was more than 99% complete; 2) the Army had begun to occupy the building; and 3) the project was constructed in strict accordance with the specifications. Count IV reiterates plaintiff's contention that the Army bore the risk of loss at the time of the storm. Therefore, according to plaintiff, when the contracting officer issued the contract modification directing plaintiff to repair the damage, the modification constituted a compensable cardinal change to the contract.

Defendant faults plaintiff for equating acceptance of its work under the contract with the Army's taking beneficial occupancy of the structures. In seeking summary judgment with regard to Counts I and IV of plaintiff's complaint, defendant argues that plaintiff cannot show that beneficial occupancy occurred prior to June 22, 1996.

Plaintiff's claim is predicated on a finding the Army had beneficial occupancy of the facilities. Defendant cites *Kinetic Builder's, Inc. v. Peters*, 226 F.3d 1307, 1315 (Fed.Cir. 2000), for the proposition that beneficial occupancy occurs when a project is "substantially complete," *i.e.*, when it can be used for its intended purpose. However, the parties in *Kinetic Builder's* did not dispute that the Army had taken beneficial occupancy of the facility in question. 226 F.3d at 1310. Plaintiff in that case failed to complete the contract on time, so the Army withheld part of the contract payments as liquidated damages for late completion and credit for unperformed work. No question was raised that the Army took beneficial occupation of the building on a fixed date.

The parties disputed, however, when plaintiff had substantially completed the contract, thereby entitling it to full payment under the contract. The appeals court equated substantial completion with the building's being capable of use for its intended purpose. *Id.* at 1315. The Federal Circuit held that, "[i]n determining whether the project is capable of being used for its intended purpose, it is necessary to consider the specific provisions laid out in the contract.... Thus, it is first necessary to identify the contract provisions defining the parties' expectations as to the owner's reasonable use of its facility." *Id.* at 1315. The court concluded that the Army specifically had negotiated to have the fire alarm system tested before it accepted the project. Although the alarm system had not been tested when plaintiff claimed its performance was substantially complete, it was, at the time of the damage, capable of being tested. Nevertheless, because such a test had not been conducted, the project was not substantially complete.

Plaintiff also misreads *Kinetic Builder's* by equating substantial completion with acceptance by the Army, which would transfer risk of loss. Even if such an argument were valid, it would not avail plaintiff. In the case at bar, plaintiff alleges that the purpose of the hangar and fuel dock was to house aircraft during maintenance. At the time of the storm, plaintiff contends that "the government had set up office furniture and equipment, staff, and temporary partitions at the project." Pl.'s Br. filed Oct. 31, 2002, at 7. Plaintiff presents no evidence regarding the fitness of the hangar and fuel dock to house aircraft. The fact that the Army had moved "personnel, furnishings and equipment" into the building, "occupying the administrative offices," Compl. ¶ 10, of the project site would not establish beneficial occupancy even under plaintiff's test. The Federal Circuit in *Kinetic Builder's* rejected as "irrelevant" plaintiff's argument that no evidence suggested the facilities could not be used for their intended purposes. 226 F.3d at 1316. As further evidence that the Army had not taken beneficial occupancy in this case, plain-

tiff's own president testified that ordinarily, when the Army takes beneficial occupancy, the contracting officer issues a beneficial occupancy date letter, commonly called a "BOD letter." The Army did not issue a BOD letter prior to June 22, 1996. In any event, case law does not support the proposition that risk of loss passes when the Army takes beneficial occupancy of a facility.

Defendant contends that the contract places liability for risk of loss on plaintiff. The contract incorporates by reference FAR § 52.236–7, the "Permits and Responsibilities" clause, and FAR § 52.236–11, the "Use and Possession Prior to Completion" clause. The former clause states: "The Contractor shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire work, except for any completed unit of work which may have been accepted under the contract." FAR § 52.236–7. The latter clause provides that "[t]he Government's possession or use shall not be deemed an acceptance of any work under the contract." FAR § 52.236–11(a). Similarly, other contract provisions make clear that the contract allocated risk of loss to plaintiff until formal acceptance by the Army. See 48 C.F.R. § 52.232–5(f)(1) (2002) (Payments Under Fixed Price Construction Contracts); 48 C.F.R. § 52.232–0016(e) (2002) (Progress Payments).

The contract directs the allocation of risk and places risk of loss squarely with plaintiff until the Army accepts the project. In order to succeed on its claim for repair expenses, plaintiff must establish, as a matter of law, that the Army had accepted the projects prior to the storm. Although the contract does not seem to offer a definitive definition of acceptance, it does prescribe that mere use or occupancy is not sufficient. Plaintiff's evidence of the Army's use of the facilities is ineffectual without more.

Defendant has discharged its initial burden to show the absence of a genuine issue of material fact. Plaintiff has not shown that a dispute exists as to whether risk of loss rested with the Army at the time of the storm. It has not cited to precedent that would reinforce its position, nor has it pointed to any contract provision that suggests risk of loss passes to the Army upon mere use of the project facilities. Therefore, defendant's motion for summary judgment on Counts I and IV of plaintiff's complaint is granted.

### 2. Breach of warranty of sufficiency of specifications/ breach of contract

■ Count II of plaintiff's complaint asserts that the contract included an express and implied warranty that the specifications were sufficient to produce a satisfactory project. Compl. ¶ 29. Plaintiff alleges that the storm destroyed the project because the Army's plans and specifications were insufficient. Compl. ¶ 30.

Defendant responds that plaintiff must show that the specifications were defective and that a causal relationship can be found between the defective specifications and the damage to the projects. Summary judgment with respect to Count II is sought because plaintiff's expert witness, John Abruzzo, cannot establish that the alleged defect in the specifications was the cause of the damage to the project. See Report of John Abruzzo at 3 (Sept. 28, 2001) ("Abruzzo Rpt.").

In response to defendant's interrogatories, plaintiff explained:

The government's specifications included the use of quick release fasteners to secure the metal siding to the hangar and fuel dock steel frames. These quick-release fasteners, available in varying strengths, are intended to reduce damage in the event of explosion inside the buildings. In the event of an explosion, the fasteners release the siding from the frame, but retain the siding on tethers to prevent flying object destruction to other property or persons. During the storm, wind entered the main hangar doors, the fasteners released, but the tethers did not hold.

Def.'s Br. filed Aug. 5, 2002, App. I at 9. Although plaintiff's first theory sponsored by Mr. Abruzzo was that the fasteners specified were not proper for the application and released too easily, thereby causing the damage, Mr. Abruzzo later testified that the single relevant defect in the Army's specifications was that "[t]he pressure that was

specified in the project specifications for release of the vented panels was too low." * Deposition of John Abruzzo at 12 (Mar. 8, 2002). The specifications required that the pressure relief panels release at 30 pounds per square foot ("PSF") of pressure, but, in Mr. Abruzzo's opinion, the panels should have been engineered to release at 40 PSF or more. Abruzzo Dep. at 12–13.

Defendant charges that Mr. Abruzzo is unable to establish the causal relationship between the specification and the damage, because Mr. Abruzzo could not testify as a matter of fact that the wind generated by the storm created pressure higher than 40 PSF. Defendant also contends that Mr. Abruzzo's testimony should be dismissed out of hand because he testified as to the hangar specification requirements, but studied only the schematics related to the fuel dock. Although Mr. Abruzzo testified that the hangar pressure panel specifications were also incorrect, defendant points out that the hangar did not have pressure relief panels. Defendant therefore urges rejection of Mr. Abruzzo's opinion testimony based on Supreme Court precedent in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The *Daubert* requirements are derived primarily from Fed.R.Evid. 702. *See Daubert,* 509 U.S. at 592–95, 113 S.Ct. 2786 (holding that trial courts are gatekeepers in determining fitness of scientific expert testimony for admissibility at trial). The Federal Circuit recently held that a trial court should not exclude an expert witness's testimony on the basis of the facts relied on by the expert witness. The focus of the trial court in a *Daubert* analysis instead should be whether the expert has shown a "reliable foundation in principles and method" for the sponsored opinion. *Micro Chem., Inc. v. Lextron, Inc.,* 317 F.3d 1387, 1392 (Fed.Cir.2003).

The fact that Mr. Abruzzo cannot establish the causal link between the specifications and the damage is not material. The role of an expert in this type of case is not to establish all the elements of the case, but to provide an expert opinion regarding its technical as-

pects. Mr. Abruzzo's reliance on the specifications and a schematic of the fuel dock does not preclude his testimony under *Daubert,* nor is his testimony precluded because his analysis is based on assumptions that may be contrary to fact. These factors will, however, affect the weight that the court will accord his testimony at trial. *See Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.,* 138 F.Supp.2d 1088, 1098 (N.D.Ill.2001) (rejecting motion to exclude expert testimony where expert based opinion on inaccurate assumptions; assumptions relied on go to weight, not admissibility of expert testimony).

Because defendant cannot displace Mr. Abruzzo's testimony, defendant has not established its entitlement to summary judgment on Count II. Plaintiff will have the opportunity at trial to establish that the Army made an express or implied warranty as to the project specifications, that those project specifications were defective, and that their inadequacy caused the damage to the hangar and fuel dock.

### 3. Breach of contract

■ Count III of the complaint seeks compensation for the cost of reconstruction, including the processing of relief pursuant to Public Law No. 85–804, in accordance with the Army's informal agreement to do so. Compl. ¶ 36. Plaintiff recites that the parties had an informal agreement that "in return for [AIC's] providing financial assistance in the completion of the Project, the Government would support and sponsor and thereby recommend extraordinary contractual relief under [Public Law No.] 85–804 in order to secure the funds necessary to reimburse [plaintiff]." Compl. ¶ 16. Plaintiff also alleges that the contracting officer during the spring of 1997 affirmatively recommended plaintiff's request for ECR.

Defendant argues that no contract was formed between plaintiff and the Army, and even if it had been, the Army performed what was required of it under any such contract. First, defendant reasons that the par-

---

* Defendant's criticism of Mr. Abruzzo for changing his mind about the cause of the damage to the facilities goes to the weight to be accorded his testimony.

ticular contract would be contrary to law because the Government did not provide the parties with the necessary prior approval pursuant to Public Law No. 85–804. Second, defendant argues that, even if there were an agreement for the Army to support plaintiff's ECR request, the Army fulfilled its obligation under such an agreement.

Public Law No. 85–804 provides that the President may authorize any governmental department or agency, which functions in connection with national defense, to enter into contracts without regard for other provisions of the law when the agency or department deems such action would facilitate national defense. 50 U.S.C. § 1431 (2003). When the relief contemplated is in excess of $50,000.00, the department or agency cannot be obligated without prior approval by an official at or above the level of an Assistant Secretary or Deputy Assistant Secretary, or an assistant head or deputy head of the requesting department or agency, or by a Contract Adjustment Board established by the agency. 50 U.S.C. § 1431.

Although plaintiff's claim recites that reconstruction of the facility cost more than $1 million, the complaint does not allege that the Government provided the requisite prior approval. Without this approval such a contract would have been unenforceable.

Plaintiff responds that the parties reached an informal agreement whereby the Army agreed to support fully plaintiff's request for ECR, but it did not do so. "[T]he government promised to recommend and 'fully support' [plaintiff's] claim for emergency relief under [Public Law No.] 85–804–authorizing agencies involved with national defense to enter into contracts-if [plaintiff] would rebuild the hangar." Pl.'s Br. filed Oct. 31, 2002, at 4. Although the contracting officer, Capt. Simms, did recommend that the Army accept plaintiff's ECR claim, plaintiff characterizes his letter as "perfunctory" and "halfhearted" and argues that he made "no effort whatsoever to follow up on the request." *Id.* at 6. Plaintiff points to the disputed question of fact as to whether the Army fully supported plaintiff's claim.

Plaintiff's former president, William C. Gray, testified that, pursuant to an agreement among plaintiff, the Army, and AIC, plaintiff would submit an ECR request and the Army would process and support the request. Deposition of William C. Gray at 139–140 (Oct. 4, 2001). The three principals agreed that plaintiff would submit an ECR claim to Capt. Simms, who, in turn, would submit it with his recommendation and support. Gray Dep. at 155. Mr. Gray testified that the Army's commitment under the agreement was for the contracting officer to support the ECR claim and acknowledged that he did so. Gray Dep. at 154–56. A letter from Contracting Officer John W. Simms to Deputy Assistant Secretary for Acquisition dated April 22, 1997, supports Mr. Gray's testimony that Capt. Simms forwarded plaintiff's ECR request with a favorable recommendation.

Plaintiff's attorney David Rost testified that "[w]hat was stated about the ECR was the surety said if the government does whatever it can to get this thing approved and will give it its full effort to do so it will start releasing money to [plaintiff]." Deposition of David Rost at 54 (Feb. 28, 2002). In Mr. Rost's opinion, such support required the contracting officer's "best effort." Rost Dep. at 58.

AIC's former counsel, David S. Berry, was also present at the meetings between the Army, AIC and plaintiff. He testified: "in exchange for [AIC] going forward and completing this project ... the government or the contracting officer and people at his level would also ... throw their support behind this ECR which would provide money to [plaintiff] to complete this project." Deposition of David S. Berry at 36 (Feb. 27, 2002).

Plaintiff has not submitted colorable evidence that the Army ever agreed to reimburse plaintiff for the reconstruction. The most that can be wrung from plaintiff's evidence is that the Army agreed to support plaintiff's forthcoming request for ECR, which plaintiff admits the Army did. The court therefore grants defendant's motion for summary judgment on Count III of plaintiff's complaint.

1. Defendant's motion for partial summary judgment is granted with respect to

Counts I, III, and IV of plaintiff's complaint, and judgment will enter for defendant on these counts.

2. Trial will be limited to Count II of the complaint regarding the project specifications.

3. A scheduling order has been entered separately.